Filed 12/11/15  In re Naomi E. CA2/3

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| In re NAOMI E. et al., Persons Coming Under the Juvenile Court Law. | B259461 |
| | (Los Angeles County Super. Ct. No. CK27238) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, | |
| Plaintiff and Respondent, | |
| v. | |
| CRYSTAL P., | |
| Defendant and Appellant. | |

APPEAL from orders of the Superior Court of Los Angeles County, Timothy R. Saito, Judge.  Affirmed.

Patricia K. Saucier, under appointment by the Court of Appeal, for Defendant and Appellant.

Mark J. Saladino, County Counsel, Dawyn R. Harrison, Assistant County Counsel, and Tyson B. Nelson, Deputy County Counsel, for Plaintiff and Respondent.

_____

INTRODUCTION

Crystal P. appeals from the orders of the juvenile court taking jurisdiction over her daughter, 12-year-old Alice E., and removing the child from her custody. (Welf. & Inst. Code, §§ 300 & 361).[1] We affirm.

FACTUAL AND PROCEDURAL BACKGROUND

1. *The petition*

The juvenile court sustained a petition under section 300, subdivision (b), failure to protect, alleging that Alice was diagnosed with Schizoaffective Disorder Depressed Type, Bi-Polar Disorder, and Mood Disorder, and suicidal ideation. Alice has attempted suicide, engages in self mutilation, and is aggressive toward others. She has been involuntarily hospitalized numerous times. She requires psychotropic medication and ongoing psychiatric treatment. The petition specifically alleged that mother "has failed to regularly provide the child with the recommended therapeutic psychiatric treatment and failed to provide the child with the child's prescribed psychotropic medication. The mother's medical neglect of the child endangers the child's physical health and safety and places the child and the child's siblings . . . at risk of physical harm, damage and medical neglect." The second count alleges that mother is "unable to provide appropriate parental care and supervision of the child Alice due to the child's mental and emotional problems," which inability endangers Alice's physical health and safety.

2. *The record*

When Alice was nine years old, psychiatrists diagnosed her as psychotic and advised mother to institutionalize her. In December 2013, when Alice was age 11, the Department of Children and Family Services (the Department) received a referral alleging that the child had been hospitalized five times in one year for psychiatric issues, and was diagnosed with bi-polar disorder. Alice acted aggressively toward her mother

---

[1] All further statutory references are to the Welfare and Institutions Code.

and siblings, Naomi E. (age 14) and C.E. (age 11).[2] She also engaged in self-mutilation by scratching her face, banging her head, and hitting and taking scissors to her legs. Alice attempted suicide "a couple" of times, most recently two days before the referral.

The family moved frequently from state to state and the disruption may have exacerbated Alice's mental instability. Mother did not fill Alice's prescriptions for psychotropic medication for two weeks after Alice was discharged from the hospital in late 2013, despite numerous referrals for free medication.

After a team decision meeting (TDM), the Department instituted family maintenance services and a full service partnership (FSP) in early 2014, through which Alice received mental health assistance, individual counseling, psychiatric services, and a medication evaluation. Mother located stable housing.

Notwithstanding the Department's involvement, Alice was hospitalized four more times: In February 2014 Alice jumped from a moving bus and then threatened to hurt the staff and peers at school. Doctors diagnosed her with a mood disorder and prescribed her Risperdal and Zoloft. In April 2014, Alice was put on a 72-hour hold after she brandished a knife and threatened to stab family members and herself. Alice was hospitalized again on May 30, 2014, the day her teacher noticed a bruise on the child's cheek. Alice reported that mother had slapped her and then kept her home for a day until the swelling went away. In July 2014, Alice threatened to kill herself and mother, and assaulted her siblings. Doctors during this hospitalization diagnosed Alice with schizoaffective disorder, depressed type and prescribed Wellbutrin and Seroquel.

Shortly thereafter, mother requested an emergency meeting because she "couldn't handle" Alice's behavior. At the TDM in late July 2014, the Department, FSP, mother's parent partner, and mother agreed to a higher level of care for Alice, such as a level-12

---

[2]    Mother also appeals from the order taking jurisdiction over her other children, Naomi and C.E. However, we take judicial notice of the juvenile court's April 9, 2015 order terminating jurisdiction over Naomi and C.E., which order renders mother's contentions as to those two children moot. We need not address mother's arguments concerning Naomi and C.E. (*In re Vincent S*. (2001) 92 Cal.App.4th 1090, 1093 ["the law does not require idle acts"].)

3

group facility or an intensive treatment foster care home.  FSP agreed to obtain a second opinion about appropriate treatment and to increase in-home services immediately.  The Department agreed to locate the higher level of care for Alice and to provide Alice with therapeutic behavioral services (TBS) immediately.

While the Department was looking for an intensive foster care placement for Alice, the child was hospitalized in August 2014 for about the eleventh time in her life.  Alice had thoughts of harming herself and claimed to have ingested six tablets of Seroquel to end her life.  She also threatened to harm her grandmother with a knife.  Alice claimed that her stepgrandmother reprimanded her for selling her toys and threatened to kill her, and her stepfather threw her on the ground and banged her head twice.  Her new diagnosis was mood disorder.

Asked whether she was willing to care for Alice with the aid of more intensive services, mother replied in August 2014 that it was a " 'little too late. . . . *At this point, I think it would be best to place Alice.  I can't take care of her and she is too much for me*. She is violent and I can't put my other children in danger.' "  (Italics added.)

The Department held a teleconference with the hospital social worker, along with representatives from the Department of Mental Health and the FSP.  The hospital reported that Alice " 'exhibits poor impulse control – needs constant redirection; participates in group.' "  She was compliant with her medication with no reported side effects.  *Mother did not want Alice to return home*.  The Department placed Alice in a 30-day emergency shelter and detained her from mother.

Mother did not want Alice in foster care but residential facilities had long wait lists.  Mother insisted that she had been proactive by going to classes at the National Alliance on Mental Illness (NAMI), and by taking Alice to see a psychiatrist monthly, a behavioral specialist bi-weekly, and therapy weekly.  However, Alice's behavior worsened after mother returned to work in April.  Mother stated:  " 'I think she [Alice] felt like she was not getting enough attention.' "  Mother had issues with Alice's medication.  One drug made the child lactate, and another made her lethargic.

Alice's stepfather claimed that Alice was terrorizing the family and that the child's behavior was getting worse and more aggressive. "Children have a choice in their behavior and how they react. . . . I believe she has chosen bad behavior," he said. The family tried to bribe Alice to do chores. They bought her a computer game to calm her down. Mother sometimes asked C.E. and Naomi to step out of the room when Alice became aggressive and violent. Mother spanked the child because Alice was out of control. Alice's siblings were happy when Alice was not at home because she caused a commotion, was aggressive, and the siblings were sometimes afraid of her.

The professionals opined that Alice required therapy, stability, and structure. The children's social worker, who worked with the family during family maintenance services, agreed with mother that Alice's behavior worsened when mother returned to work. The social worker stated that Alice " 'is very challenging and needs lots of structure. Alice needs to be in a placement for the time being. Mother needs lots of one on one parent education to help her support Alice's mental health needs. Alice thrives when she gets one on one attention. Family therapy needs to be in place before Alice transitions home to avoid Alice being the scapegoat of the family.' " Likewise, the clinical psychologist at the Department of Mental Health who participated in the TDM in December 2013 explained that the home environment is a large factor in how the child copes and performs. A child with Alice's history needs structure, stability, and consistency. Alice needed a stable placement to obtain her baseline and an accurate diagnosis. She would also benefit from a structured environment, therapy, and medication management.

In fact, Alice posed no major problems in her placement, was following rules, and got along well with others. She was seeing a therapist and a psychiatrist. She had no problems taking medication. Alice reported that she liked her medication because it helped her and made her happy. She did not like living at home because she did not like her stepfather, who hit her. The last time she lived at home, her cousin, grandmother, and stepfather all hit her. She acknowledged hitting herself, her stepfather, and sometimes her mother.

5

Mother has a history with child protective services in San Bernardino County dating back to 1994, when she was a dependent minor. There was domestic violence with mother's first husband. Mother "elected" not to reunify with three older children, one of whom is in long term foster care, and the two others were adopted.

The Department recommended that the juvenile court declare the children dependents and place Alice in foster care as it did not appear that mother was able to care for Alice. Mother did not fill Alice's psychotropic medication even with referrals for free medication. Despite multiple in-home services, the family had three referrals for physical abuse, and Alice was hospitalized five times for a lifetime total of 11. Mother consented to Alice's current detention because she did not feel she was capable of caring for the child. Mother needed education in how to parent a child with mental illness and counseling to help her deal with the stress of a mentally ill child. Alice needed the stability, consistency, structure, and support that she was receiving in her placement.

At the adjudication hearing, mother testified that she did not fill Alice's prescription for nearly three weeks after the child's hospital discharge because she did not have cash or Medi-Cal and because she was "very skeptical" of the medications' side effects. Asked whether she had the supervision of a psychiatrist when she stopped dispensing medication to Alice, mother testified, "[t]hat was my parental right not to give my child a drug that was making her hallucinate. I feel as a parent, I have that right. [¶] I mean, I'm with my child 24 hours a day. I know what's good for my child. I know what's bad. And *I'm not going to give her medication just because a doctor prescribes it. If it's not good for her, I'm not going to give it to her*." (Italics added.) Finally mother obtained a different evaluation and a new prescription. Mother acknowledged having "a lot of difficulty with" Alice. Still, she claimed to have been the child's biggest advocate starting when Alice was six years old and sought help for the child. Mother was sure she could provide Alice with all needed treatment if the child returned home.

The juvenile court sustained the petition. The court recited from the record and concluded that "this family does not truly appreciate the severity of this issue nor are adequately equipped to address [Alice's] mental health issues." Despite all of the

6

services and therapy already in place, the family believed Alice was simply seeking attention and acting up, and that the solution was to bribe her to do her chores or to isolate her until she calmed down.  The court cited the psychologists' opinion that Alice needed a stable home environment and to be understood.  The court found that Alice was not simply an incorrigible teenager, but a youth who needed help.  The lack of structure in the home, the lack of understanding of Alice's mental health issues, mother's failure to fill Alice's prescription for more than two weeks, and mother's lack of parenting education to help her support Alice's mental health needs, put Alice at risk that the situation could "escalate[] to a more dire level," and turn Alice into a scapegoat.  The court was mindful that mother had many services in place, but they did not help as Alice was nonetheless hospitalized five times in less than a year, and mother requested that the child be removed from mother's care.

The court removed Alice from mother's custody (§ 361, subd. (c)) and ordered her suitably placed.  The court ordered mother into an approved plan of parenting to address developmentally appropriate issues, one-on-one classes to address children with mental illness, individual counseling to address family dynamics, dealing with mental health issues, and conjoint counseling.  The court ordered the entire family to continue with NAMI, along with the other programs already in place.  Mother was awarded monitored visitation.  Mother appealed.

CONTENTIONS

Mother contends that the jurisdiction and disposition findings lack substantial evidence.

DISCUSSION

1. *The jurisdictional order is supported by substantial evidence*.

Section 300, subdivision (b)(1), in pertinent part, describes a child who "has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of the failure or inability of his or her parent or guardian to adequately supervise or protect the child" or "by the willful or negligent failure of the parent or guardian to provide the child with adequate food, clothing, shelter, or medical treatment."

7

The definition in subdivision (b) "consists of three elements: (1) neglectful conduct by the parent in one of the specified forms; (2) causation; and (3) 'serious physical harm or illness' to the minor, or a 'substantial risk' of such harm or illness." (*In re Rocco M*. (1991) 1 Cal.App.4th 814, 820.) Although "evidence of past conduct may be probative of current conditions, the question under section 300 is whether circumstances *at the time of the hearing* subject the minor to the defined risk of harm." (*Id*. at p. 824.)

"[S]ection 300 does not require that a child actually be abused or neglected before the juvenile court can assume jurisdiction. [Section 300, subdivision (b)] require[s] only a 'substantial risk' that the child will be abused or neglected. The legislatively declared purpose of [section 300] 'is to provide maximum safety and protection for children who are currently being physically, sexually, or emotionally abused, being neglected, or being exploited, and to ensure the safety, protection, and physical and emotional well-being of children *who are at risk of that harm*.' (§ 300.2, italics added.) 'The court need not wait until a child is seriously abused or injured to assume jurisdiction and take the steps necessary to protect the child.' [Citation.]" (*In re I.J*. (2013) 56 Cal.4th 766, 773.) "[T]he court may . . . consider past events when determining whether a child presently needs the juvenile court's protection. [Citations.] A parent's past conduct is a good predictor of future behavior. [Citation.] 'Facts supporting allegations that a child is one described by section 300 are cumulative.' [Citation.] Thus, the court 'must consider all the circumstances affecting the child, wherever they occur.' [Citation.]" (*In re T.V*. (2013) 217 Cal.App.4th 126, 133.)

In an appeal challenging the sufficiency of the evidence to justify a finding or order, we look for substantial supporting evidence, contradicted or uncontradicted. (*In re Heather A*. (1996) 52 Cal.App.4th 183, 193.) When "making this determination, we draw all reasonable inferences from the evidence to support the findings and orders of the dependency court; we review the record in the light most favorable to the court's determinations; and we note that issues of fact and credibility are the province of the trial court. [Citation.]" (*Ibid*.) We do not reweigh the evidence or exercise independent judgment, or assess credibility (*In re Casey D*. (1999) 70 Cal.App.4th 38, 52); we

"merely determine if there are sufficient facts to support the findings of the trial court." (*In re Matthew S*. (1988) 201 Cal.App.3d 315, 321.)  Thus, the pertinent inquiry is whether substantial evidence supports the finding, not whether a contrary finding might have been made.  (*In re Dakota H*. (2005) 132 Cal.App.4th 212, 228.)

Mindful of these rules, we conclude the record contains sufficient evidence to support the juvenile court's finding that Alice is described by section 300, subdivision (b)(1) because she has suffered and is at substantial risk of suffering serious physical harm or illness as a result of mother's "inability . . . to adequately supervise or protect" her.  (*Ibid*.)  The record shows, as the juvenile court found, that the instability and lack of structure in the home, the failure to appreciate the gravity of Alice's illness, the withholding of medication, and the lack of education about parenting a mentally ill child, resulted in repeated hospitalization and physical abuse of Alice, and placed her at serious risk of more harm, blame, and scapegoating.

Mother contends no parental unfitness or neglectful conduct placed Alice at risk. Mother insists that she has a "very clear understanding of Alice's mental health issues[.  She has] educated herself and her children regarding Alice's issues, and she had a team in place working with Alice and the family."  However, not only has mother repeatedly sought institutional help because she could *not* take care of Alice or control her behavior, but as the Department notes, two incidences of physical abuse, five psychiatric hospitalizations, three weeks without prescribed medication, and physical abuse by others in the home belie mother's assertion she and the team can provide Alice with needed care.  What mother fails to comprehend is that even after Departmental intervention, TBS and FSP services, and repeated meetings, Alice continued to be hospitalized.  Once placed, however, Alice received the needed consistency, was compliant, got along well with others, and liked taking her medication.

In arguing there is no evidence of parental unfitness or neglect, mother relies on *In re Precious D*. (2010) 189 Cal.App.4th 1251.  *Precious D*. held "parental unfitness or neglectful conduct must be shown in order to assert dependency court jurisdiction under that part of section 300(b) providing for jurisdiction based on the parent's 'inability . . . to

adequately supervise or protect the child.' " (*Id*. at p. 1254.)[3] In *Precious D*. the only finding "critical of Mother's parenting skills or conduct" in relation to her "incorrigible teenage daughter," who repeatedly ran away from home and from foster placements during a period of voluntary family maintenance, was that the mother and her daughter were not communicating. (*Id*. at pp. 1253 & 1259.) The appellate court reversed the section 300, subdivision (b) jurisdictional order for lack of evidence because the record showed that the mother and daughter were in daily telephone contact and the Department recognized that there was " 'open communication between the mother and the child.' " (*In re Precious D*., at p. 1259.) The Department admitted that the reason it sought dependency court jurisdiction was the child's incorrigible behavior and need for court-ordered services, not because of any neglectful conduct by the mother. In fact, the Department made no claim that the mother was unfit to parent her daughter. (*Ibid.*, fn. 2.)

Unlike *Precious D*., the record here contains ample evidence supporting the finding of parental unfitness and neglect as well as willful failure to provide required medication. Mother admitted she hits Alice because she cannot control her daughter. Mother also failed to prevent others from hitting Alice. Rather than to rely on the advice of a psychiatrist, mother withheld prescribed medication from Alice in exercise of her claimed parental right, and based on her own medical assessment that the prescribed drugs were not good for Alice.[4] The Department sought protection of the juvenile court

---

[3] The Department counters that we need not follow *Precious D*. because *In re R.T.* (2015) 235 Cal.App.4th 795, held that no showing of parental blame is required before a court may assert dependency jurisdiction over a child. However, apart from the fact that the Supreme Court has granted review of *In re R.T.* on this very point (June 15, 2015, S226416), we conclude that *Precious D*. is distinguishable from this case and so we need not rely on *In re R.T.*

[4] Mother insists she was not medically negligent because the treatment she was providing to Alice was sufficient as evidenced by the fact the Department did not change the protocol once voluntary services commenced. This argument ignores the opinion of the Department of Mental Health psychologist that Alice had yet to receive an accurate diagnosis.

10

for Alice because of mother's neglect and unfitness demonstrated by her inability to care for, protect, or control the child's aggression and violence, and the need for court-ordered services for mother. Unlike *In re Precious D*., a case of simply an incorrigible teenager and no evidence of parental unfitness or neglect, this case involves a seriously mentally ill child who is a danger to herself and others, and parental unfitness, neglect, and failure to provide medication.

Mother argues, citing *In re J.N*. (2010) 181 Cal.App.4th 1010, 1014-1016, that one incident of withholding medication is insufficient to bring the child within the juvenile court's jurisdiction. *In re J.N*. involved a single incident of parental unfitness, a drunk-driving accident that injured the children (*ibid.*) and no evidence that the children were at a risk of harm by the time of the jurisdictional hearing. (*Id*. at p. 1025.) Yet, the withholding of medication is not the only incident of parental unfitness here. The withholding in the past coupled with mother's insistence at the jurisdiction hearing that she knew what was good for Alice and that she was not required to give the child medication "just because a doctor prescribes it," evinces mother's lack of understanding of what is needed for Alice and serves as a reliable predictor of mother's future behavior. (*In re T.V*., *supra*, 217 Cal.App.4th at p. 133.) In sum, the cumulative record here reveals multiple incidences of failure to protect, in addition to mother's refusal to administer Alice's prescribed medication, and supports the juvenile court's finding that Alice is described by section 300, subdivision (b).

2. *The dispositional order is supported by substantial evidence*.

Section 361, subdivision (c) directs, "[b]efore the court may order a child physically removed from his or her parent, it must find, by clear and convincing evidence, that the child would be at substantial risk of harm if returned home and that there are no reasonable means by which the child can be protected without removal. [Citations.]" (*In re Cole C*. (2009) 174 Cal.App.4th 900, 917, citing § 361, subd. (c)(1).)

When " 'determining the appropriate disposition, the court shall receive in evidence the social study of the minor made by the probation officer, any study or evaluation made by a child advocate appointed by the court, and such other relevant and

material evidence as may be offered.' [Citation.] This statutory command envisions that the juvenile court will be provided with a broad spectrum of evidence shedding light on the circumstances of the minor and his or her family. [Citation.] Of necessity, in virtually every case, the court will have before it conduct or circumstances of family members not pleaded in the petition." (*In re Rodger H*. (1991) 228 Cal.App.3d 1174, 1183, quoting from § 358, subd. (b).) "In this regard, the court may consider the parent's past conduct as well as present circumstances. [Citation.]" (*In re Cole C.*, *supra*, 174 Cal.App.4th at p. 917.) Furthermore, the "parent need not be dangerous and the child need not have been actually harmed for removal to be appropriate. The focus of the statute is on averting harm to the child. [Citations.]" (*Ibid.*) "The court's principal concern is a disposition consistent with the best interests of the minor." (*In re Rodger H.*, *supra*, at p. 1183.)

While the juvenile court must make its finding under section 361, subdivision (c) by clear and convincing evidence, on appeal, we review the order for substantial evidence. (*In re Christopher R*. (2014) 225 Cal.App.4th 1210, 1216, fn. 4.)

Mother contends the removal order was not supported by substantial evidence. She cites her testimony that she recently developed a treatment plan that is more thorough than what had existed. She testified she, Alice, the behavioral specialist, therapists, and mother's parent partner, developed a safety plan for responding to Alice's violent outbursts and aggression. Mother argues, the juvenile court erred when it found there was no reasonable alternative to removal.

Although mother insists she has recently developed a more complete plan to meet the child's needs, the record shows she also admitted in August 2014 that she could not care for Alice even with more intensive services. Furthermore, the juvenile court took jurisdiction over Alice because mother's lack of understanding and insight into the severity of Alice's illness and her inability to address Alice's behavior, even with in-home services. The record is replete with references to Alice's need for medication management and for stability and structure. Mother's reaction to Alice's violence and aggression, which she admitted she is unable to control, has been to hospitalize her

temporarily, hit the child, or segregate her, all of which conduct is unsafe and undermines the stability, structure, and consistency that Alice needs. The Department and therapists have explained that educating mother on how her actions play a role in Alice's illness and behavior is an important aspect of protecting the child. After Alice was removed from mother's custody, the child was compliant, followed rules, posed no major problems, and freely took her medication, without reservation. Therefore, there is sufficient evidence to support the juvenile court's finding by clear and convincing evidence that returning Alice home would put her at substantial risk of physical harm and there is no reasonable means by which the child can be protected without removal.

DISPOSITION

The orders appealed from are affirmed.


**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


ALDRICH, J.


We concur:



EDMON, P. J.



JONES, J.*

---

*      Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.